## Case No. 15,182.

UNITED STATES v. GALBRAITH.

[Hoff. Op. 77; Hoff. Dec. 20.]

District Court, N. D. California. Jan. 22, 1861.[1]

CALIFORNIA LAND GRANTS—EXPEDIENTE AS EVIDENCE—ALTERATION OF TITLE PAPERS—FAILURE TO OCCUPY.

1. If the expediente be genuine, it affords evidence of the issuance of the grant far more satisfactory than the production of the title papers by the party interested: for the only safe and reliable documentary evidence in this class of cases is that afforded by the records found in the archives.

2. A fraudulent attempt to alter the date of a grant so as to obviate an apprehended objection to its validity, can have no effect to take away from a claimant any lands actually granted to him before the acquisition of the country by the United States. U. S. v. West's Heirs, 22 How. [63 U. S.] 319, followed.

3. The grant of the governor vests a title in the grantee which must be confirmed unless he has been guilty of such unreasonable neglect to comply with the conditions of the grant as justifies the inference that he abandoned it during the existence of the former government. But no such inference can be drawn from a neglect to occupy and settle before the conquest, where the grant was made less than a month before the capture of Monterey, especially as the disturbed condition of the country made it dangerous for the grantee to remain in the vicinity. U. S. v. Fremont, 17 How. [58 U. S.] 442, applied.

[This was a claim by James D. Galbraith to the Rancho Bolsa de Tomales, five square leagues, in Marin county, granted June 12, 1846, by Pio Pico to Juan N. Padilla; claim filed April 29, 1852, confirmed by commission April 11, 1854, by the district court December 1, 1854. Case unreported. Decree reversed by the supreme court, and cause remanded for further proofs. 22 How. (63 U. S.) 89. The case is now heard upon further proofs taken.]

HOFFMAN, District Judge. The claim in this case was confirmed by the board, and by this court; but, on appeal, the decree

[1] [Reversed in 2 Black (67 U. S.) 394.]

of this court was reversed, and the cause remanded for further proofs. Further proofs have accordingly been taken, and the case is again presented for decision. The documents relied on by the claimants, are:

### Title Papers.

(1) A petition of Juan N. Padilla to the governor, dated at Monterey, May 14, 1846, soliciting five square leagues of land, known as Bolsa de Tomales. (2) A certificate of Castro, prefect of the First district, stating the land to be vacant and grantable; also dated at Monterey, May 10, 1846. (3) A marginal reference for information, signed by Pio Pico, and dated May 20, 1846. (4) A decree of concession dated Los Angeles, June 12, 1846. (5) The borrador, or office copy, of the formal title delivered to the party, which is usually found among the papers remaining on file among the archives.

All the foregoing documents are found in the archives, and compose what is called the "expediente."

The claimants have also produced from their own custody, the original title delivered to the grantee, and a certificate of approval by the departmental assembly.

### Frauds in Title Papers.

With respect to these last two documents, there can be no doubt that the first or formal title has been altered, the date having been changed from June 12th to February 12th, 1846. The certificate of approval is also evidently a forgery. No minute of any such action can be found in the journals of the departmental assembly, and the signature of Pio Pico, with which the court is very familiar, and the various forms of which, as shown by the archives, were considered at large in the case of Luco v. U. S. [23 How. (64 U. S.) 515], has, I am satisfied, either been forged or signed by him long subsequently to the date of the document.

### Expediente Genuine.

The expediente, however, found in the archives, bears every mark of genuineness. The petition is partly in the handwriting of Arce, and partly in that of Padilla, the grantee. The marginal decree of concession and the borrador of the title are in the handwriting of Moreno, the secretary, and the signatures of that officer and of Pio Pico, the governor, are evidently genuine, and such as were used by them at the date of the documents. The certificate of Castro and his signature are also in his handwriting; and from an examination of the original documents in the archives, I can see no reason to doubt the genuineness of the entire expediente. Such is the opinion of Mr. Hopkins, the keeper of the archives, on whom, for his great intelligence, long familiarity with the archives, and unquestionable integrity, it is not too much to say that more reliance should be placed than on almost any

number of the hackneyed and professional witnesses, who usually testify in this class of cases.

This opinion is corroborated by several facts.

1. On the back of the expediente is found an endorsement: "Bolsa de Tomales, concedido a Juan NePomunceno Padilla, No. 571." This endorsement is in the handwriting of Mr. W. E. P. Hartnell, by whom and Maj. Halleck the expendientes on file among the archives. in 1847 were examined and numbered. The numbering was continued from the last number in Jimeno's index. Endorsements were made on the expedientes made up subsequently to the date of the last on that index, and a list similar to that of Jimeno was prepared. On that list the grant in this case is noted. and its number, No. 571, exactly corresponds with its date; No. 570 being dated a few days before the 12th of June, the date of this grant, and No. 572 a few days after. It has been frequently proved, and the fact is undoubted, that this numbering was effected by Mr. Hartnell, early in 1847, and the list prepared shortly afterwards. There can, I think, be no doubt of the existence of this expediente in the archives, in 1847.

There are some other, but slighter, corroborations of this conclusion furnished by the documents themselves. The petition, as has been stated, is dated Monterey, May 14th. The certificate of Castro is dated May 10th. Both purport to have been written at Monterey. They must therefore have been taken to Los Angeles to be submitted to the governor. On examining the marks or creases in the paper, it is evident that both documents were folded together, precisely as would have been the case if made into a single package and placed in one envelope. The appearance of the paper, the color of the ink, &c., in all respects correspond with other documents of unquestionable authenticity dated about the same time; and the handwriting of Castro, which is somewhat peculiar, bears a like resemblance to other official documents written by him about the same time. If, then, this expediente was in the archives in 1847, it follows that it must have been executed by Pio Pico before his flight from Los Angeles to Lower California, in August, 1846, for he did not return to this country until 1848, nearly a year after this expediente had been indexed and numbered by Mr. Hartnell. That Pio Pico was in Los Angeles on the 12th of June and even so late as the 16th of that month, is clear, from official communications. &c., to the ayuntamiento of that pueblo, signed by himself and Moreno, and dated on the 15th June; and I can see no reason for assuming that the grant was not executed on the day it bears date. It is to be remembered that although the date of the capture of Monterey has been in acts of congress and the decisions of the supreme court fixed, as

the period of subversion of Mexican authority and the date of the conquest, its importance could not,· in July, 1846, have been suspected. The capital of the department still remained in the hands of the Mexicans. The authority of the governor was recognized and enforced throughout all the southern portions of the department. The departmental assembly had not ceased to hold its sessions, and the most important conflicts which occurred in California took place after the capture of Monterey. Whatever reasons may exist for fixing the date of the actual or rather constructive conquest of the country, it can hardly be supposed that Pio Pico, when asked to sign a grant in July, would have suspected that he imparted additional validity to it by dating it in the preceding month. I am not aware that it has ever appeared that Pico actually signed any grant in July or August, and attached to it an earlier date, although several cases have occurred where the dates of documents, actually signed in those months, have since been altered, so as to make them appear to have been executed before the 7th July.

Some stress was laid upon the fact that the marginal order for an informe is dated May 20th, while the certificate of Castro giving the required information is dated May 10th, and must then have been before the governor. But I find nothing in this not susceptible of easy explanation. The usual marginal order may have been drawn, and the proceedings suspended until the informe was received, without adverting to the circumstance that the information was already furnished by Castro. Such an oversight is by no means improbable. And it is not until the 12th of June, when perhaps the attention of the governor was called to Castro's certificate, and he was urged to issue the grant, that he makes the decree of concession, and signs the formal title paper. If, then, the expediente be genuine, it affords evidence of the issuance of the grant far more satisfactory than the production of the title paper by the party interested. For, as has been so often remarked by this court, the only safe and reliable documentary testimony in this class of cases is that afforded by the records found among the archives.

### The Fraud does not Injure Title.

The only question which can be raised is —does the fact that a certificate of approval by the assembly has been forged, and the date of the grant altered, forfeit the land to the United States, or—what is the same thing —prevent this court from confirming the claim? As the duty of this court, under the act of 1851 [9 Stat. 631]. is to inquire what lands were private and what public at the date of the treaty of cession, it would seem obvious that the determination of that question cannot be affected by the circumstance that since that date a fraud has been at-

tempted to be perpetrated. If the only evidence of the making of the grant, was the title paper itself, it might be that the court would be compelled to refuse to admit the altered paper in evidence, and then to reject the claim for want of testimony to support it. But we have the further and far more satisfactory evidence furnished by the archives; the petition, which shows that the lands were solicited; the informe of Castro, which shows them to have been vacant; the decree of concession, which shows that the governor acceded to the petition, granted the land, and directed the formal title to issue, and the borrador or the office copy of the grant actually delivered to the party, in all respects the counterpart of that produced by claimants; except that in the latter the date has been altered from June to February. It is unnecessary, however, to further discuss the question, for the decision of the supreme court in the case of U. S. v. West's Heirs, 22 How. [63 U. S.] 319, is a direct authority on the point. Under the ruling in that case, it must be taken as law that a fraudulent attempt to enlarge a grant —still less an attempt to alter it so as to obviate an apprehended objection to its validity—can have no effect to take away from a claimant, lands actually granted to him before the acquisition of the country by the United States.

With regard to the possession, the evidence is not satisfactory. The proofs, I think, show that Padilla, who was the owner of an adjoining rancho, drove his cattle upon the land now claimed, the pasture on his own having been consumed by fire. The same range was also frequented by the cattle of Bojorques, another adjoining ranchero, and a dispute having arisen between the two, it was decided by the alcalde that Bojorques should remove his cattle, and those of Padilla should remain. This occurred in 1845, and before Padilla had received any grant, or even applied for the land. The decision of the alcalde seems to have been founded on a previous permission to occupy the land provisionally granted to Padilla by the first alcalde. It would seem that the raqueros of Padilla constructed a small hut of poles and tules, to afford shelter while tending their herds. But there was no permanent settlement effected, nor any other occupation than such as has been mentioned. In the spring of 1846, Padilla, having become involved in the disputes between the Americans and his countrymen, was compelled to leave the northern part of the country, and his cattle were sold or withdrawn from the Bolsa de Tomales. It is clear that no possession was ever taken under the grant or as a fulfillment of its conditions. And the only occupation of the tract was such as has been described. But it has been decided that

the grant of the governor vests a title in the grantee which must be confirmed unless he has been guilty of such unreasonable neglect to comply with the conditions as justifies the inference that he had abandoned his grant during the existence of the former government. U. S. v. Fremont, 17 How. [58 U. S.] 442. But no such inference can be drawn from a neglect to occupy and settle during the brief period which intervened between the date of the grant, June 12th, and the conquest of Monterey, July 7th, especially as the disturbed condition of the country, owing to the Bear Flag hostilities, and the relations between Padilla and the American settlers, who had risen against the California authorities, made it dangerous for him to return to that part of the country.

Under the views originally entertained by this court, the claim would have been rejected on the ground that the grant, not having been confirmed by the assembly, constituted but an imperfect or inchoate title, which the United States was not bound to perfect unless the claimant could show either some antecedent consideration, or an occupation and settlement effected under and on the faith of the grant, sufficient to give him an equitable right to demand its completion by the United States. But under the ruling in the case of U. S. v. Fremont [supra], evidence of occupation and settlement cannot now be exacted, nor is the inquiry into those facts material, unless it be alleged that there has been unreasonable neglect to fulfill the conditions, amounting to an abandonment. Under any circumstances, I should of course feel bound to govern my decision by the rulings of the supreme court. But in these cases, where the rules of decision as laid down by that tribunal, have long been known and accepted as the law, where the property has been frequently transferred and may have passed into the hands of bona fide purchasers for value, who have invested their money, relying upon the stability of the rules laid down by the highest tribunal of the country, it would be doubly improper in an inferior court to decline to decide in accordance with those rules, whatever might be its opinion as to their original correctness.

As, then, the proof shows that the grant issued on the 12th June, 1846, prior to the date of what has been regarded as the conquest of the country, and the final subversion of the Mexican authority,—as no unreasonable neglect can be imputed to the claimant,—the case appears to me one which, under the decisions of the supreme court, ought to be confirmed. A decree must be entered accordingly.

[The decree confirming the claim was reversed by the supreme court upon appeal by the United States. 2 Black (67 U. S.) 394.]